UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMMA CAMPBELL,

          No. 08-12035

    Plaintiff,          District Judge Nancy G. Edmunds

v.          Magistrate Judge R. Steven Whalen

BORTZ HEALTH CARE OF OAKLAND,

    Defendant.
_____/

## **REPORT AND RECOMMENDATION**

Before the Court is *Motion for Summary Judgment* pursuant to Fed. R. Civ. P. 56 [Docket #16] by Defendant Bortz Health Care of Oakland which has been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion be GRANTED, dismissing this case with prejudice.

### **I. BACKGROUND FACTS**

On May 8, 2008, Plaintiff, a former employee of Defendant Bortz Health Care of Oakland ("Bortz"), a long-term care facility located in Orion, Michigan, filed the instant action alleging that Defendant engaged in racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, resulting in her July 13, 2007

suspension and July 25, 2007 discharge.[1]

Plaintiff, proceeding *pro se*, alleges she began working as a dietary aide at Defendant's health care facility on May 5, 2006 and at the time of her termination on July 25, 2007, worked as a housekeeper. *Complaint* at 6. Plaintiff alleges that on July 9, 2007, a Caucasian administrator in a supervisory position, Janet Lieder, accused her of harassing Caucasian coworker Nikki Hersha[2] on the previous day. *Id.* at 3. Plaintiff, informed by Lieder that the complaint would be investigated, denied the accusation. *Id.* Contrary to Lieder's accusation, Plaintiff alleges that on July 8, she witnessed "a loud argument" between Hersha and another staff member. *Id.* Plaintiff denies ever harassing or stalking Hersha, alleging instead that she went out her way to avoid Hersha. *Id.* at 4. Plaintiff alleges that Hersha was a "troublemaker," stating that on a previous occasion, Hersha falsely reported to other coworkers that Plaintiff had mishandled medical waste. *Id.* at 3-4. Plaintiff alleges

---

[1] The record contains numerous references to Plaintiff's statements to coworkers prior to her dismissal that she intended to take legal action against Bortz. However, the Complaint does *not* allege that Plaintiff was terminated in retaliation for asserting her rights. Following her dimissal, Plaintiff filed a later dismissed charge with the National Labor Relations Board ("NLRB"), alleging retaliatory motives in her termination. *Docket #16*, Exhibit S. The NLRB charge alleges that Plaintiff was dismissed for complaining that a Caucasian coworker, rather than she, was appointed to a job for which both applied. Because the Complaint does not contain allegations of retaliation and Plaintiff later expressly conceded that the Caucasian coworker was promoted on the basis of seniority, the Court will not address possible retaliatory motives in the termination. *Docket #16,* Exhibit A at pg. 70, ln. 17- pg. 71, ln. 18.

[2] The Complaint incorrectly refers to coworker Nickki Hersha as "Niki Harnsh." *Complaint* at 3.

that Lieder also confronted her with reports by other coworkers falsely accusing Plaintiff of inappropriately entering patients' rooms while nurses were performing personal care functions. *Id.* at 4. Plaintiff alleges that in compiling accusations against her, Lieder "only talk[ed] with people that didn't like [her]" *Id.* at 4.

Plaintiff alleges that upon being suspended on July 13, 2007 by Lieder, she experienced a panic attack and was taken from the workplace to Crittendon Hospital for treatment. *Id.* at 4-5. The Complaint alleges that on the same day, Lieder called other employees into her office for the purpose of creating statements against Plaintiff. *Id.* at 5. Plaintiff alleges that she was informed of her termination by telephone on July 26, 2007, but did not discover the existence of the July 13 statements by her coworkers until August 7, 2007. *Id.* Plaintiff denies workplace improprieties, noting that her work background includes operating her own cleaning service, a supervisory housekeeping position at a nursing home, and housekeeping at St. Joseph's Hospital in Pontiac, Michigan for 15 years. *Id.* at 4.

Defendant's account of the events in question differs from Plaintiff's, stating that it fired Plaintiff after receiving "repeated complaints from numerous African-American, Hispanic and Caucasian employees about Plaintiff abusing them, insulting them, interfering with their work, and causing discord in the workplace." *Defendant's Motion for Summary Judgment*, at 2, *Docket #16.* Defendant notes that Plaintiff acknowledged that while she worked in Dietary, she experienced personality conflicts leading to her transfer to the housekeeping department in December, 2006. *Id., Docket #16,* Exhibit A, pgs. 55-56.

-3-

Within months of her May, 2006 starting date, Plaintiff complained to her direct supervisor, Heather Vickery, that she was not receiving as many hours as Robbie Burton, a black coworker. *Id., Docket #16,* Exhibit A, pgs. 57-59, 65. Although Defendant alleges that Plaintiff, at that time a part-time employee, was informed that giving her more hours would result in overtime pay, "while scheduling the same hours for Ms. Burton did not involve overtime," Plaintiff renewed her complaints in March, 2007. *Id.* at 3, Exhibit A, pgs. 59-60.

Defendant alleges that during the same month, Plaintiff, along with several coworkers applied for a full-time position in housekeeping. *Id.* at 3. Defendant alleges that Plaintiff approached the same coworkers, urging them to withdraw their applications on the basis that she "needed the hours." *Id.* Defendant states that the position was filled by Janis Model, a Caucasian woman chosen on the basis that she had the highest seniority. *Id., Docket #16*, Exhibit E. On April 6, 2007, Plaintiff's coworker Robbie Burton made a written complaint to a supervisor, stating that Plaintiff had pulled Burton's time card in an attempt to prove that Burton was receiving favorable treatment. *Id.* at 4, *Docket #16,* Exhibit D, ¶10(g). The complaint by Burton states that Plaintiff continued to bring up the subject during working hours and at one point, followed Burton into the women's restroom to continue the discussion. *Docket #16,* Exhibit F. On May 7, 2007, coworker Kizzy Burton (daughter of Robbie) filed a complaint, stating that "[Plaintiff] has been harassing me since the incident with . . . my mother." *Defendant's Brief* at 4-5, *Docket #16,* Exhibit H. Plaintiff was not disciplined for either incident. *Id.* at 4-5.

On June 25, 2007, Bortz received a letter from the adult son of a recently deceased resident, stating that as his mother's body was being removed from the premises, Plaintiff remarked that the deceased woman "has not had a visitor for the last year." *Id.* at 5, *Docket #16,* Exhibit I. The letter writer stated that he had visited his mother on an almost daily basis, noting that Plaintiff's alleged comment was untrue as well as inappropriate. *Id.* Defendant alleges that upon requesting a copy of her personal file on June 29, 2007, Plaintiff discovered that on June 18, 2007, coworker Sharon Brewer had submitted a statement accusing Plaintiff of work performance deficiencies. *Id.* at 6, *Docket #16,* Exhibit A, pgs. 90-92. In response, Plaintiff submitted a response on July 6, 2007, accusing Brewer of slander, and of backdating her complaint to June 18, 2007. *Id., Docket #16,* Exhibit J. On July 9, 2007, Nicki Hersha filed a complaint against Plaintiff, alleging that she repeatedly entered patients' rooms at inappropriate times and on one occasion, dumped medical waste into a hallway. *Id., Docket #16,* Exhibit K. Hersha alleged that Plaintiff became verbally abusive when asked to leave the patients' rooms or instructed in medical waste disposal protocol. *Id.* at 6-7, *Docket #16,* Exhibit K. The following day, Plaintiff denied harassing Hersha to administrator Janet Lieder, and Bortz Vice President Judy Smythe. *Id.* at 7, *Docket #16,* Exhibit A at 97-99. Defendant also alleges that on July 11, 2007, Plaintiff, loitering on the workplace premises two and a half hours after her shift was ended, became argumentative when Lieder asked her to wait for her ride in the lobby. *Id.* at 7-8.

Defendant alleges that Plaintiff's July 13, 2009 suspension occurred after employee Annette Taylor reported that Plaintiff made a snide remark to her in the presence of a patient.

*Id.* at 9, *Docket #16,* Exhibit Q. Lieder alleges that upon informing Plaintiff of her suspension, Plaintiff became hysterical, rocked back and forth, yelled, and "kick her feet into the air." *Id.* at 10, *Docket #16,* Exhibit D, ¶¶13-14. Lieder states that after Plaintiff became combative, Lieder called 911 and upon EMS's arrival, Plaintiff was transported to Crittendon Hospital. *Id., Docket #16,* Exhibit D, ¶14.

Noting that additional employees had made verbal and written complaints regarding Plaintiff's behavior before the July 13, 2007 suspension, Defendant states that Plaintiff was informed that she was being terminated as of July 25, 2007 because she had violated Bortz's workplace conduct code by harassing other employees. *Id., Docket #16,* Exhibit C. Defendant denies that Plaintiff's race played a role in either her suspension or termination.

On August 13, 2007, Plaintiff filed a charge of racial discrimination with the EEOC. On December 31, 2007, the EEOC found insufficient evidence to support Plaintiff's claim. *Docket #16,* Exhibit T. Plaintiff's October, 5, 2007 filing with the National Labor Relations Board, alleging that she was discharged in retaliation for complaining about Caucasian Janis Model receiving the full-time housekeeping position, was later dismissed for insufficient evidence. *Id.*, *Docket #16,* Exhibit S.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

### III. ANALYSIS

Plaintiff has offered no evidence that anyone in a decision-making position expressly stated a desire to remove, demote or stymie the career prospects of her or any other employee based on race. Plaintiff's claim of race discrimination is thus based on circumstantial evidence. Accordingly, the burden-shifting approach, first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 37 L.Ed.2d 668 (1973), applies. *See also Johnson v. Kroger Co.*, 319 F.3d 858, 865-66 (6th Cir. 2003). Under that framework, the Plaintiff must present a prima facie case of unlawful discrimination. If she can do so, the

burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).[3] If the Defendant satisfies that burden, the Plaintiff must then prove, by a preponderance of the evidence, that the proffered reason for the Defendant's actions is not the true reason, but rather a pretext for discrimination.

### A. Elements of a Prima Facie Case

In order to establish a prima facie showing of racial discrimination, Plaintiff must introduce sufficient evidence that (1) she was a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the adverse action was taken under circumstances giving rise to an inference of unlawful discrimination, *i.e.*, "treated differently from similarly situated individuals outside of [the] protected class." *Smith v. City of Salem, Ohio,* 378 F.3d 566, 570 (6th Cir. 2004)(*citing Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000)); *McDonnell Douglas, supra,* 411 U.S. at 802, 1824.

### B. Defendant's Argument

Defendant, conceding that Plaintiff meets the first two prongs of the *McDonnell Douglas* test, argues that Plaintiff cannot establish the third or fourth prong of a prima facie case of discriminatory termination. *Defendant's Motion for Summary Judgment* at 12-15. Defendant argues first that Plaintiff's well-documented history of verbally abusing coworkers

---

[3]This is a burden of production. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001).

and her workplace breakdown on the day of her suspension show that she was not qualified to work at the long-term care facility. *Id.* at 12-14. In regard to the fourth prong, Defendant contends that Plaintiff cannot establish that she was treated differently than similarly-situated non-African American employees. *Id.* at 14-15 (*citing Noble v. Brinkler Int'l, Inc.,* 391 F.3d 715, 729 (6th Cir. 2004)).

### C. Plaintiff Cannot Establish a Prima Facie Case of Racial Discrimination

That Plaintiff, an African American, has met the first element of a discrimination claim is not in dispute. Likewise, Plaintiff's July 13, 2007 suspension and July 25, 2007 termination constitute adverse actions.[4]

The third element, whether Plaintiff was qualified for the position from which she was discharged, requires a review of the evidence in its entirety. The Court notes first that a number of Defendant's contentions stand at odds with either Plaintiff's deposition testimony

---

[4] The Complaint alleges violations of Title VII only in the investigation leading to Plaintiff's suspension and termination. Subsequent filings by both Plaintiff and Defendant also include evidence that during Plaintiff's tenure at Bortz, she filed a grievance with her union on the basis that she was unfairly receiving fewer working hours than her coworker Robbie Burton. *Docket #16,* Exhibit A, pgs. 57-58, 69. Because the Complaint does not allege that the disparity in assigned hours constituted discrimination, it will remain undiscussed here. Further, because Burton is also African-American, Plaintiff would be unable to establish the fourth prong of the *McDonnell Douglas* test. *Defendant's Motion for Summary Judgment* at 13.

Likewise, the Court declines to address Bortz's appointment of a Caucasian individual, Janice Model, to a position for which Plaintiff applied in March, 2007. The Complaint makes no reference to the appointment, and further, Plaintiff has since conceded legitimate, non-discriminatory reasons (seniority) exist for awarding the job to Model. *Id., Docket #16,* Exhibit A, pgs. 70, ln. 17- pg. 71, ln. 18.

or other portions of the record. Plaintiff, originally assigned to the Dietary department of the facility, alleges that she felt compelled to request a transfer after experiencing a personality conflict with coworker Kizzy Burton. *Docket #16,* Exhibit A, pg. 56. Noting that staff members routinely ate the remaining food after the residents were fed at mealtime, Plaintiff contends that she was singled out for reprimand on the one occasion that she helped herself to leftovers. *Id., Docket #16,* Exhibit A, pgs. 45-46, *Docket #24* pg. 28 of 50.

Defendant argues that Plaintiff, believing that Robbie Burton was unfairly receiving additional hours, harassed Burton and accessed Burton's time card for the purpose of confirming her belief that she was being shortchanged. *Defendant's Motion for Summary Judgment* at 2-3. However, Plaintiff, noting that she filed her own complaint against Burton, denies that she harassed the coworker. *Response, Docket #30,* pgs. 7-8, 10-14 of 50. Statements by coworkers Juliet Alisbo and Cecelia Pass, suggesting an ongoing personality conflict between Plaintiff and Robbie Burton rather than a "stalker/victim" dynamic, are at least somewhat inconsistent with Defendant's characterization that Plaintiff "stalked" Burton. *Id.,* pgs. 2, 5. On April 24, 2007, Plaintiff and Burton mutually agreed to withdraw their complaints against each other. *Docket #24,* pg. 44 of 50, *Docket #30* pg.10 of 50.

Other workplace improprieties are contradicted by the record. Defendant alleges that on June 25, 2007, the father of a deceased resident complained that as his mother's body was being retrieved from the facility, Plaintiff remarked within earshot of the funeral home staff that the mother had not had any visitors for the past year. *Defendant's Motion for Summary*

*Judgment* at 5, *Docket #16.,* Exhibit I.  Upon being informed by the funeral home staff of Plaintiff's alleged remark, Jim Vorhees, the son of the deceased resident, sent an emotional letter of complaint, declaring that Bortz employed "a female employee on [its] staff who should *not be*!"  Defendant does not bother to add that followup correspondence from Vorhees shows that Bortz denied that a staff member had made the remark, instead attributing the "no visitors in a year" comment to his deceased mother's roommate.[5] *Docket #30,* pgs. 30-32 of 50.

Further, while Defendant alleges that on July 11, 2007, Plaintiff was seen loitering about the workplace premises well after her shift ended, Plaintiff (having experienced car trouble) testified that Lieder was already aware that she was waiting for a ride. *Compare Docket #16,* Exhibit D at ¶11-k, Exhibit A, pg.101.  Plaintiff denies the allegation that she was "roaming the hallways," noting that while employees waiting for rides were customarily allowed to wait in the dining room, Lieder curtly directed her to wait in the lobby. *Id.* Exhibit A, pg. 103.  Plaintiff also denies that she was argumentative when Lieder ordered her to wait in the lobby, stating that she chose to remain outside because she was offended by

---

[5]

Defendant also claims that co-worker Juliet Alisbo reported that she heard Plaintiff making the statement.  *Defendant's Motion for Summary Judgment* at 5. Plaintiff denies Alisbo's handwritten account of the incident. *Docket #30,* pg. 28 of 50.  Alisbo's June 16, 2007 account, written in rudimentary English, contrasts with the July 13, 2007 typewritten, grammatical, and well organized account of Plaintiff's eccentricities that Defendant attributes to Alisbo. *Compare Docket #16,* Exhibit O with *Docket #30*, pg. 28 of 50.  Plaintiff testified that Alisbo informed her that after the July 13, 2007 suspension, Lieder directed Alisbo to sign her name to an already typewritten account of Plaintiff's behavioral problems.  *Docket #16,* Exhibit A, pgs. 88-89, *Docket #30,* pg. 29 of 50.  .

Lieder's tone and her belief that she was again being singled out for unfair criticism. *Id.,* Exhibit A*,* pgs. 103-105.  In an apparent response to coworkers' complaints that Plaintiff had stated that she "saw good spirits" around one coworker as well as various other inappropriate spiritual references, Plaintiff implies that her statements were no more inappropriate than comments made by other Bortz employees, noting that on one occasion, Lieder arranged for a priest to sprinkle holy water in the facility's dining room after employees voiced concerns that the building was "cursed." *Docket 24-2,* pg. 50 of 50, *Docket #24-3,* pg. 7 of 44.  Plaintiff also denies Hersha's allegations of both stalking and dumping wound care dressings in a corridor. *Docket #16,* Exhibit A, pg. 95, *Docket #24-3,* pgs.11-13 of 44.  While Plaintiff acknowledges that upon being informed of her suspension on July 13, 2007, she yelled, cried, and called for her mother, she denies Lieder's claim that she also "kick[ed] her feet in the air." *Compare Docket #16,* Exhibit D at ¶14, *Id.* Exhibit A, pg. 132, *Docket #24-3* at 30 of 44.

However, even setting aside Defendant's rebuttable claims, *i.e.,* that Plaintiff "stalked" other employees and falsely stated that a deceased resident had not received visits from her family, overwhelming evidence supports the conclusion that Plaintiff's frequent and repeated disputes with coworkers provided grounds for her suspension and termination.

Rule 18 of Bortz's Code of Conduct states that "[a]busive treatment, verbal or physical, of residents, visitors, other employees, and/or fighting on premises" provides grounds for

immediate dismissal. *Docket #16,* Exhibit C.

For example, while Plaintiff's dispute with Robbie Burton was resolved amicably in April, 2007, problems with numerous other coworkers snowballed in the ensuing weeks leading up to the July 13, 2007 suspension. Coworker Kizzy Burton (daughter of Robbie Burton) filed a grievance on April 5, 2007, stating that Plaintiff was harassing her. *Docket #16,* Exhibit H. On July 9, 2007, Nikki Hersha complained that Plaintiff became verbally abusive when Hersha asked her to leave patients' rooms at the time personal care functions were being performed. *Id.,* Exhibit K. Hersha also reported that "I [overheard Plaintiff's] conversations with other employees. And I feel they are directed to me because she always says them when I am within hearing distance. The comments are '[t]he white [g]irl doesn't like people like me: The white girl doesn't believe in God." *Id.*

Coworker Calvin Clemmons reported that on July 7, 2007, Plaintiff swore at him repeatedly, following him as he walked through a corridor leading to the residents' rooms. *Id.,* Exhibit L. Clemmons' account of the incident is supported by statements by Annette Taylor and Wynette House. *Id.,* Exhibits M-N. While Plaintiff denies swearing at Clemmons, she admits that they engaged in workplace verbal disputes. *Docket #24-2,* pg. 22 of 50. While Plaintiff denies responsibility for any of her quarrels with other Bortz employees, her submissions alone (in large part duplicating the material found in the Exhibits accompanying Defendant's motion) establish that she experienced frequent run-ins with multiple coworkers. This evidence defeats the third prong of a prima facie case–whether

Plaintiff was qualified (tempermentally or otherwise) for the position.

As to the fourth prong, Plaintiff does not even allege that similarly-situated non-protected class employees would not have been subject to reprimand or termination for violating Rule 18 of Bortz's Code of Conduct. Likewise, in regard to her work situation in the months preceding her termination, Plaintiff cannot establish that similarly-situated non-African Americans committing the same infractions would have been treated differently. Again, Plaintiff's own account of events show that in addition to disputes with Caucasian employees Sharon Brewer, Nikki Hersha, Annette Taylor, and Sue Hazelton, multiple African-American co-workers filed complaints against her.

Plaintiff admits that she first requested a transfer from the Dietary department as a result of a conflict with Kizzy Burton, an African-American coworker, acknowledging that she later engaged in disputes with African-American coworkers Robbie Burton and Calvin Clemmons. Wynette House, also African-American, supported Clemmon's account of his July 7, 2007 altercation with Plaintiff. Because Plaintiff cannot establish a racial motive in Defendant's actions, the veracity of her belief that she was repeatedly singled out for criticism by Lieder and picked on by her coworkers is a moot point. Beyond Plaintiff's allegations that she was African-American, Lieder was Caucasian, and that Lieder terminated her, her failure to allege how Lieder treated her differently than similarly-situated Caucasian or Hispanic employees is fatal to her claim.

Moreover, even assuming that Plaintiff met all four prongs of a prima facie case, the

above-discussed evidence would satisfy the Defendant's burden under the second prong of *McDonnell Douglas* that there were legitimate, non-retaliatory reasons for the termination, *i.e.,* Plaintiff was suspended only after numerous African-American, Hispanic, and Caucasian employees complained about her disruptive behavior.

Likewise, under the third prong of *McDonnell Douglas*, Plaintiff cannot establish that Defendant's reasons for terminating her were pretextual. To be sure, a portion of Defendant's evidence fails to present adequate grounds for dismissal pursuant to Rule 18 of Bortz's Code of Conduct. Nonetheless, Defendant has more than adequately established (1) a factual basis for the dismissal (2) that the dismissal was precipitated by increasingly frequent and serious complaints by coworkers, and (3) that Plaintiff's numerous disputes with coworkers were sufficient to support the discharge. *Manzer v. Diamond Shamrock Chemicals Company*, 29 F.3d 1078, 1084 (6th Cir. 1994)(*citing McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993)).[6]

## IV. CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED, dismissing the case with prejudice.

---

[6] To establish that Defendant's reasons for the dismissal were pretexual under *Manzer*, Plaintiff would be "'required to show by a preponderance that either (1) that the proffered reasons had no basis *in fact* (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge'"*Id.* at 1084 (*citing McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993))(emphasis in original).

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
UNITED STATES MAGISTRATE JUDGE

Dated: July 23, 2009

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 23, 2009.

                    s/Susan Jefferson

                    Case Manager